60 F.3d 1329
 Prod.Liab.Rep. (CCH) P 14,293
Raymond CAMPBELL; Charlene Campbell, Plaintiffs-Appellees,
Winter Brothers Material Company, a corporation; Liberty
Mutual Insurance Company, a corporation,
Intervenor-Plaintiff,
v.
AMERICAN CRANE CORPORATION, Defendant-Appellant.
 No. 94-2450.
 United States Court of Appeals,
 Eighth Circuit.
Submitted Feb. 15, 1995.
Decided July 27, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Sept.
20, 1995.
 
 Marcia E. Hurt, Cleveland, OH, argued (Frederick W. Whatley, Cleveland, OH, on the brief), for appellant.
 Kenneth A. Leeds, St. Louis, MO, argued (Preston E. Roskin and Joshua Cates, Clayton, MO, on the brief), for appellees.
 Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 American Crane Corp. (American) appeals from a final judgment entered in the United States District Court for the Eastern District of Missouri upon a jury verdict finding it liable to Raymond and Charlene Campbell (plaintiffs) under a theory of strict liability for failure to warn. For reversal, American argues (1) the district court erred in refusing to grant its motion for judgment as a matter of law because plaintiffs failed to make a submissible case under Missouri law, (2) the district court abused its discretion in allowing plaintiffs' counsel to argue material facts not in evidence, and (3) the district court abused its discretion in refusing to grant a new trial because the verdict was against the clear weight of the evidence. For the reasons discussed below, we reverse.
 
 I. BACKGROUND
 
 2
 Raymond and Charlene Campbell filed this strict liability action in Missouri state court in June 1991, two years after Raymond Campbell fell off the boom of a crane manufactured by American Hoist and Derrick in 1980. American is the successor in interest to American Hoist and Derrick. The case was subsequently removed on the basis of diversity. Plaintiffs twice amended their complaint. Their claims originally included negligence, manufacturer's defect, design defect, and failure to warn. Plaintiffs admit that, at trial, they abandoned all claims except their claim of strict liability for failure to warn.
 
 
 3
 From approximately 1975 to the present, Raymond Campbell (Campbell) has worked as a crane operator for Winters Brothers Materials Co., which supplies cement, sand, and gravel. As part of his duties, he performed maintenance on the crane, and as part of this maintenance, he periodically (approximately once every three months) changed a wire cable which is threaded through the crane's boom. To perform this task, Campbell would walk the length of the boom, a distance of some ninety feet. Campbell also greased the boom's sheave (a pulley which guides the cable) approximately twice a week. While greasing the sheave, Campbell frequently walked the length of the boom. On June 13, 1989, Campbell was in the process of replacing a cable on the crane's boom when a lacing (a structural support beam on the boom) allegedly broke. Campbell fell about twelve feet and sustained back injuries.
 
 
 4
 After a two-day trial, a jury rendered a verdict in favor of Raymond Campbell, awarding him damages in the amount of $500,000. The jury also awarded damages to Charlene Campbell in the amount of $20,000 on her related loss of consortium claim. American's post-trial motions for judgment as a matter of law or new trial were denied by the district court without opinion. Campbell v. American Crane Corp., No. 91-1555-C (E.D.Mo. Apr. 29, 1994) (Order). This appeal followed.
 
 II. DISCUSSION
 
 5
 Under Missouri law, a plaintiff seeking to recover in strict liability for failure to warn must prove that (1) the defendant sold the product in the course of his or her business, (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics, (3) the defendant did not give an adequate warning of the danger, (4) the product was used in a manner reasonably anticipated, and (5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning. Tune v. Synergy Gas Corp., 883 S.W.2d 10, 13 (Mo.1994) (banc) (Tune ); Nesselrode v. Executive Beechcraft, 707 S.W.2d 371, 382 (Mo.1986) (banc) (Nesselrode ); see Mo.Rev.Stat. Sec. 537.760 (1995). Further, there are two separate requirements of causation in a failure to warn case: (1) the product for which there was no warning must have caused Campbell's injuries, and (2) the plaintiff must show that a warning would have altered the behavior of those involved in the accident. Tune, 883 S.W.2d at 14, citing Arnold v. Ingersoll-Rand Co., 834 S.W.2d 192, 194 (Mo.1992) (banc) (Arnold ).
 
 
 6
 American argues inter alia that plaintiffs are barred from recovery as a matter of law because their theory of liability was predicated on the imposition of strict liability for failure to warn of an open and obvious danger. American argues that plaintiffs' counsel indicated that the danger against which Campbell should have been warned was the potential of falling off the boom. American argues that the danger of falling off the boom is so readily apparent that the product cannot, as a matter of law, be deemed "unreasonably dangerous."
 
 
 7
 This case exemplifies the importance of coherent theories of liability. Throughout the trial, plaintiffs' counsel presented a number of inconsistent variations on the failure to warn theory which have left us with an opaque record. At certain points, plaintiffs' counsel appeared to argue that the product was unreasonably dangerous because of the risk that the boom's lacings welds might develop internal cracks, which could be detected only by sophisticated testing methods. Plaintiffs' evidence further suggested that their theory of liability was based upon American's failure to warn of the danger of such internal weld cracks. Moreover, in the present appeal, plaintiffs argue that this was in fact the basis of the claim for damages:
 
 
 8
 There was more than ample evidence to conclude that at the time it [American] manufactured its crane and put it in the stream of commerce[, American]: (1) knew that users of its crane walked across the boom; (2) knew that the welds attaching the lacings to other structural elements of the boom could crack and that the cracks could go undetected; (3) knew that users of its product might not have either the experience or tools necessary to properly evaluate the sufficiency of the lacings or lacing welds, and that in spite of this knowledge the Appellant failed to effectively communicate, i.e. warn, anticipated users of its product, like Ray Campbell, not to walk across the boom.
 
 
 9
 Brief for Appellee at 5.[1] The position plaintiffs currently maintain on appeal simply does not square with the theory of liability offered at trial.
 
 
 10
 During a bench conference in which the parties argued over the scope of a particular witness's testimony, plaintiffs' counsel made the following statements:
 
 
 11
 My case, Judge, is that this guy should never be out there regardless of what caused him to fall, whether he slipped and fell or whether a lacing broke. That's my case.
 
 
 12
 ....
 
 
 13
 So the record is clear, my case and it's always been my case that it doesn't matter whether the lacing broke or not. My case is and always has been and this is no surprise, that he should never have been up there.
 
 
 14
 I Trial Tr. 191-192. These statements reveal that plaintiffs were not proceeding on a theory that American was liable for a failure to warn of the internal cracks in the weld. Rather, this theory of liability assumes that the hazard against which American failed to warn was the danger of falling off the boom. Plaintiffs' counsel reiterated this position in closing argument to the jury:
 
 
 15
 [American] knew ... that there was a foreseeable risk of someone slipping on the boom of that crane while hauling a piece of heavy cable and I think we can all agree that that's an obvious and a dangerous practice.
 
 
 16
 ....
 
 
 17
 [American's] argument is if it's open and obvious, we don't need to do anything about it. That's incorrect. Because if it's open and obvious, [American has] a duty to give [Campbell] an alternative. [American has] a duty to advise [Campbell] of a safe manner to do it [threading wire cable through the boom].
 
 
 18
 I Trial Tr. 354. Toward the end of closing argument, plaintiffs' counsel again expressly disavowed reliance on any structural defect or inherently dangerous characteristic, other than the danger of falling off the boom:
 
 
 19
 The thing that was most likely to happen is that Ray would have slipped and fell. I agree that it's likely that that weld would have broken, but let's talk about the weld. I don't want to talk about it because I don't think it's relevant. I don't think the absence of timbers [structural supports on the boom] is relevant because whether the lacing broke or he slipped--if there is a warning on the side of the crane, we have all seen warnings, stop do not thread boom by walking across, something like that.
 
 
 20
 I Trial Tr. 360. This argument clearly urged the jury to find that American should be held liable for failing to warn Campbell of the possibility that he may incur injury if he slips and falls while walking on the boom. Now, plaintiffs argue a theory of liability under which they can only recover if the lacing broke because of an internal weld crack.
 
 
 21
 A careful reading of the entire transcript in the present case reveals the ever-changing characterization of their failure to warn theory. However, we have two clear statements of their trial theory. One comes in the above-quoted bench conference, and the other in plaintiffs' brief to this court. As noted, in order to make "the record clear," plaintiffs' counsel at trial said that their case in no way relied upon a broken lacing. I Trial Tr. 191-192. Presently, however, plaintiffs argue that American was strictly liable for failure to warn because of the danger of internal lacing weld cracks. Of course, if no crack occurred, the requisite causal connection would be lacking because one cannot be liable for failing to warn of a danger which has not been encountered. Thus, it is readily apparent that the trial and appellate theories are inconsistent.
 
 
 22
 It is a general rule of appellate practice that "a reviewing court will consider a case only on the theory upon which it was tried in the district court." St. Louis Developmental Disabilities v. Mallory, 767 F.2d 518, 521 (8th Cir.1985), citing Wright v. Newman, 735 F.2d 1073, 1076 (8th Cir.1984). Therefore, we need not consider the strict liability for failure to warn theory that plaintiffs have formulated on this appeal. We review only the theory which plaintiffs submitted below.[2]
 
 
 23
 The Missouri Supreme Court has stated that the determinative issue in a strict liability failure to warn case is "whether the information accompanying the product effectively communicates to the consumer or user the dangers that inhere in the product during normal use and the dangerous consequences that can or will result from misuse or abnormal use of the product." Nesselrode, 707 S.W.2d at 382. However, manufacturers are not required to provide a warning for every potential hazard:
 
 
 24
 Manufacturers and distributors are not under a duty to provide warnings about dangers which are open and obvious, or which are commonly known. If the user of a product knows or reasonably may be expected to know of a particular danger, strict liability will not result from a failure to warn of that danger.
 
 
 25
 Grady v. American Optical Corp., 702 S.W.2d 911, 915 (Mo.Ct.App.1985) (citations omitted).
 
 
 26
 Plaintiffs' theory, as repeatedly articulated by their counsel at trial, was that Campbell should never have been up on top of the boom because of the danger that he might fall off. Pled as a strict liability failure to warn case, this theory must fail. While we recognize that the issue of the adequacy of Campbell's knowledge of the risks inherent in the product is normally for the jury to determine, Palmer v. Hobart Corp., 849 S.W.2d 135, 140 (Mo.Ct.App.1993), certainly Campbell, a crane operator with many years of experience, can have reasonably been expected to know of the open and obvious danger that he could fall from the boom. For plaintiffs to recover under their trial theory, we would have to hold American liable for failing to warn Campbell not to walk on the boom because he might fall. Such a warning, however, would in no way provide Campbell with additional knowledge of the inherent characteristics of the crane. See Arnold, 834 S.W.2d at 194 (holding that plaintiff's failure to warn claim should not have been submitted to the jury because the evidence did not indicate that a warning would have imparted additional information). Accordingly, we hold that the district court erred in failing to grant judgment as a matter of law to American.
 
 III. CONCLUSION
 
 27
 For the reasons discussed above, the judgment of the district court is reversed.
 
 
 28
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 29
 Ordinarily I would be reluctant to dissent in a diversity case, but here my reading of the record is so contrary to that of the majority that a dissent is required. It seems clear to me that Raymond Campbell fell when a lacing broke, causing him to fall to the ground, rather than simply slipping and falling off the boom while threading the crane.
 
 
 30
 The plaintiffs tried this case on a failure-to-warn theory, and American defended on the same theory. The district court instructed the jury on that theory, and neither party objected to the wording of the instruction. There were two aspects of plaintiffs' failure-to-warn theory: (1) that American failed to adequately warn Campbell of the danger of threading the crane by walking on the boom while carrying a cable, and (2) that American failed to warn Campbell that a strut could break under Campbell's weight.
 
 
 31
 Campbell presented both theories in Count III of his Second Amended Complaint and throughout the trial. The complaint reads, in relevant part:
 
 
 32
 That while walking across the braces/struts of the boom of the aforementioned crane and while in the process of threading same, one of the braces/struts upon which Plaintiff was walking broke.
 
 
 33
 ....
 
 
 34
 a. The brace/strut upon which Plaintiff was standing at the time that he fell was not properly welded;
 
 
 35
 b. The weld of the brace/strut that Plaintiff was walking on at the time said brace/strut was welded was not properly inspected;
 
 
 36
 c. Plaintiff was not given adequate warning of the possibility that the braces/struts of the crane could break under Plaintiff's weight;
 
 
 37
 ....
 
 
 38
 f. Failed to require that the welds of the boom be periodically inspected by means of magnetic particle inspection or other non-intrusive inspection methods other than mere visual inspection.
 
 
 39
 Second Amended Complaint, at 1-2, 5.
 
 
 40
 In his opening statement, Campbell's counsel stated:
 
 
 41
 On the day that Ray got hurt, what happened was one of these lacings broke. It broke, there is no dispute that it broke. Ray will testify that it broke. He was on it, and even though the person that rewelded it is deceased--he died, he just died--you can see that there is a new weld there where it had been refastened.
 
 
 42
 Tr. 89-90.
 
 Counsel for American responded:
 
 43
 As you can see, the location of the broken lacings was some ten feet from the place where that timber was located. The place where the lacing was broken that he apparently stepped on that simply gave was located 14 inches from where a timber should have been which shows that when that cable came down and snapped that lacing and damaged it, much of the same manner that you can see in these photographs, apparently the repeated slapping and damage of the lacing caused the lacing to break. When he stepped on it, obviously the lacing was broken. The weld may not have been broken because it's much stronger than the lacing, but the tubular steel simply gave as a result of the repeated damage to the boom's lacings.
 
 
 44
 ....
 
 
 45
 Number four, that as a result of that and the damage which we will show you occurred, those lacings were weakened, and the one lacing was obviously cracked because when he stepped on it and it broke, down he went. So we think at the conclusion of the case you will agree that this man was injured not because somebody failed to warn about walking on the boom or failed to warn or failed to tell them how to carry the cable from one point to another, but because of the misuse and abnormal use by using the crane without the timbers resulting in damage to the crane which was never repaired. Mr. Campbell will tell you know [sic] one routinely inspected the crane. The crane was just used and it was used in that damaged condition. We think that will be your conclusion at the end of the case, and if it is, we will ask you to return a verdict for the defendant.
 
 
 46
 Tr. 108, 113.
 
 
 47
 During the trial a conflict developed as to the plaintiffs' theory of the case. The following colloquy occurred during plaintiffs' examination of Donald E. Alberts, American's chief design engineer:
 
 
 48
 [Mr. Leeds]: So before this crane was manufactured you had knowledge about the method in which people were threading the crane by walking across the boom?
 
 
 49
 A. That's correct.
 
 
 50
 Q. And you will agree with me, won't you, sir, that it is foreseeable that an individual walking across this boom pulling a heavy rope that it is foreseeable that there is a potential they could fall?
 
 
 51
 MR. MENGHINI [counsel for American Crane]: Your Honor, I will object that it's irrelevant to the issues in this case. We are talking about falling off the crane.
 
 
 52
 MR. LEEDS: It's absolutely not irrelevant. Can we have a side bar on this?
 
 
 53
 ....
 
 
 54
 [BENCH CONFERENCE.]
 
 
 55
 MR. MENGHINI: The plaintiff didn't fall. A lacing gave and he fell through. That's the case that we are trying. This is not a situation where he slipped and fell off the crane. So what difference does it make? Not only that, he is asking him for an opinion which the jury can form without him opining on it and he has not been designated as an expert witness to do.
 
 
 56
 MR. LEEDS: My case, judge, is that this guy should never be out there regardless of what caused him to fall, whether he slipped and fell or whether a lacing broke. That's my case.
 
 
 57
 THE COURT: No. Your case is the specific facts, which in this situation is that this weld gave loose on the boom. The real problem that I see, however, is that you are asking him for expert opinion. He has not been designated as an expert and Ray Charles could see that you have a potential for falling off of anything that you are walking on, so we don't need an expert for that.
 
 
 58
 ....
 
 
 59
 MR. MENGHINI: Can I speak to that, Your Honor, just momentarily? I have prepared a brief for the Court in support of a motion for directed verdict which addresses this very point. If that's his case, Missouri law is crystal clear that you don't have to warn of the obvious, and you just made the point that anybody can be asked can you slip and fall off the crane, so we are going to address that issue sooner or later.
 
 
 60
 ....
 
 
 61
 THE COURT: Yes, but it's obvious that you can fall off anything. I don't know that that requires a directed verdict, because you have the situation with the cable. So that's an additional factor there, and as to whether or not that's a safe procedure and whether or not the company should have been advising people how they should do it, but I think it's obvious that anybody can fall off anything.
 
 
 62
 Tr. 190-93.
 
 Mr. Alberts then continued his testimony:
 
 63
 [Mr. Leeds:] Sir, when you went out there you knew that this case was about a man falling due to an alleged lacing breaking, correct?
 
 
 64
 A. Yes.
 
 
 65
 ....
 
 
 66
 [MR. MENGHINI:] Mr. Alberts, counsel on direct examination asked you if it was possible for a weld to have a crack in it which would go undetected and I think you said yes, it's possible.
 
 
 67
 A. Yes.
 
 
 68
 Q. In this case do you understand that Mr. Campbell's testimony has been that he was walking along the boom when he put a foot on the lacing in question and the lacing collapsed; is that your understanding?
 
 
 69
 A. That's correct.
 
 
 70
 ....
 
 
 71
 A. I was looking at the lacing that I was told had failed and I was looking at the welds trying to identify whether the welds looked like they were solid or defective and structural integrity of the boom and the rest of the welds on the boom to see if they were solid welds or defective.
 
 
 72
 [MR. MENGHINI:] The complaint that was filed in this case that we had available to us before we went out there, did that contain a complaint at that time that the welds were bad?
 
 
 73
 A. That's correct.
 
 
 74
 Q. And that somehow the welds had something to do with this lacing failing?
 
 
 75
 A. Yes.
 
 
 76
 ....
 
 
 77
 Q. Now, when you examined the particular lacing that failed here, could you tell--well, first of all, the lacing was repaired. I think you testified it was rewelded?
 
 
 78
 A. Yes.
 
 
 79
 Q. Could you tell from your examination whether it was the weld that failed or the lacing that failed?
 
 
 80
 A. It was impossible to tell because the repair that they had made covered up exactly what had happened. It destroyed the evidence.
 
 
 81
 Q. So you have no idea in this particular case whether it was a damaged lacing or a weld that was damaged that failed to cause the failure?
 
 
 82
 A. I couldn't tell from looking at it.
 
 
 83
 Tr. 199, 203, 208-09, 232 (emphasis added).
 
 
 84
 Shortly thereafter, during a bench conference, counsel for American repeated:There is no duty on the manufacturer to warn somebody that they might fall off the crane. The problem with that is that he didn't fall off the crane. We are trying something here that is a lacing that gave way.
 
 
 85
 Tr. 249.
 
 
 86
 American argued that the strut broke because Campbell's employer failed to properly use and maintain the crane, and thus American, the manufacturer, bore no liability. American's counsel asked the following of engineer Ronald M. Kohner:
 
 
 87
 Q. Do you have an opinion, sir, as to whether the absence of the timber at or near the place where the lacing failed had anything to do with the failure of this lacing that caused Mr. Campbell's injury?
 
 
 88
 ....
 
 
 89
 A. My opinion is that if the timbers had been in place, this damage that we see on much of the boom could not have taken place, and in my opinion that's the damage that caused the lacing to fail when he stood on it at a subsequent time.
 
 
 90
 Tr. 303.
 
 
 91
 The record in this case makes it abundantly clear that the plaintiffs' claim was not simply "that Campbell should never have been on top of the boom because of the danger that he might fall off" as the majority characterizes it. Rather, it was a two-fold claim that American failed to warn as to two dangers, neither of which was obvious. American defended each of these claims. First, it argued that threading the crane by walking on the boom while carrying a cable was an obvious danger. Equally important to American's defense, however, was the additional argument that the crane itself was safe as manufactured, that it was damaged by misuse, and that but for the misuse, the lacing would not have broken under Campbell's weight and Campbell would not have been injured.
 
 
 92
 The jury heard all the evidence and rejected American's defense. We should not upset the factual findings made by the jury after it received a failure-to-warn instruction that neither side objected to; above all, we should not do so on a theory that American did not advance at trial. For American to argue on appeal that there is no evidence in this record that Campbell fell because a lacing broke is disingenuous and must be rejected.
 
 
 93
 The jury may have rejected the plaintiffs' failure-to-warn theory regarding walking across the boom--concluding that the danger was so obvious that they should not be permitted to recover on that theory--but accepted plaintiffs' theory that American's failure to warn of the danger of a strut breaking was not obvious, thus deciding that the plaintiffs were entitled to recover on that theory. This possibility is not a basis for reversal in this case. American made no effort at trial to have the court give the jury separate instructions on the two failure-to-warn theories. Rather, American argued, on the one hand, that the danger of slipping and falling while carrying the cable across the boom was so obvious that recovery must be denied on that theory; and, on the other hand, that American could not be liable under the theory of failure to warn of the likelihood of a strut breaking because the damage to the strut was caused by Campbell's employer rather than any manufacturing defect or any failure to warn of a defect in the strut. In my view, we should affirm the district court in all respects. Accordingly, I dissent.
 
 
 
 [1]
 We note that plaintiffs stress the knowledge of American. However, in a strict liability failure to warn context, "liability may be imposed without regard to defendant's knowledge or conduct." Nesselrode v. Executive Beechcraft, 707 S.W.2d 371, 383 (Mo.1986) (banc)
 
 
 [2]
 Our opinion should not be read, however, to limit in any way a plaintiff's ability to plead and argue alternative and even inconsistent theories of liability. See generally Fed.R.Civ.P. 8; Mo.Rev.Stat. Secs. 509.050 and 509.110 (1986)