971 F.Supp. 416 (1997)
Juan JAUREQUI, Plaintiff,
v.
JOHN DEERE COMPANY and Deere & Company, Defendants.
No. 1:93CV00080 ERW.
United States District Court, E.D. Missouri, Eastern Division.
July 2, 1997.

*417 *418 *419 MEMORANDUM AND ORDER

WEBBER, District Judge.
This matter is before the Court on the motion of defendants John Deere Company and Deere and Company to exclude expert witness testimony of plaintiff's proposed experts, Harold Wakeley and Terrence Willis [document # 29] and on the motion of defendants for summary judgment [document # 28].
On September 6, 1987, plaintiff Juan Jaurequi suffered severe injuries when he became entangled in the gathering chains and snap rollers of a John Deere Model 343 corn head while working as an intern at Texas Triumph Seed Company of Ralls, Texas. Plaintiff initially brought an action in state court in Texas against various defendants, seeking damages for his injuries. After a prolonged history, this action has made its way to this Court and is finally nearing a resolution.
The only remaining claims before this Court are claims for damages against defendants John Deere Company and Deere and Company (hereinafter "defendants"). Relevant to these remaining claims, plaintiff's first amended complaint, filed August 18, 1989, alleges that plaintiff was injured by a corn head manufactured by defendants. Plaintiff alleges a strict liability claim that the corn head was defective because "it did not have a proper guard to prevent a person from becoming enmeshed in the machine, a clutch to disengage moving chains, and adequate warnings." Plaintiff alleges that the product was unreasonably dangerous and that defendants failed to provide adequate warnings. Plaintiff also alleges a claim in negligence, asserting that defendants were negligent in designing and marketing the corn head by defendants' "failure to install a guard on the product to prevent a user from becoming enmeshed in the product's chains, by their failure to install a clutch to disengage moving chains, and by their failure to warn of the danger of becoming enmeshed in the product's chains."[1]
Defendants have moved for summary judgment on these claims and have filed an interrelated motion to strike plaintiff's expert witnesses. Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). When presented with such a motion, this Court must determine whether there "are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary" will not preclude a summary judgment. Id. at 248, 106 S.Ct. at 2510. When evaluating a motion for summary judgment, the Court must view the facts in the light most favorable to the party against whom the motion is directed, giving such party the benefit of all reasonable inferences to be drawn from the facts. Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir.1982). However, the party opposing the summary judgment motion "may not rest upon mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

I. Factual Background
Before addressing the motion for summary judgment and the motion to strike plaintiff's *420 expert witnesses, the Court sets forth the uncontested factual events which gave rise to this action. The John Deere Model 343 corn head was manufactured and sold in 1974 in Moline, Illinois. At the time the Model 343 was sold by defendants, it contained two black and yellow warning stickers, each approximately 3 inches by 4 inches in size. The stickers were located in places that were visible to some degree to the operator of a combine and to anyone who approached the corn head from the side or front. One sticker, using a bold "CAUTION" heading, provided:
1. Keep all shields in place.
2. Disengage and shut off all engine and/or motor power before servicing of unclogging machine.
3. Keep hands, feet, and clothing away from power-driven parts.
The second sticker, using a bold "WARNING" heading, provided:
Rolls in gathering units move faster than you can let loose of stalk.
Disengage power and shut off engine before unclogging rolls.
Around 1986, the corn head was purchased by Carter Manufacturing on behalf of plaintiff's employer, Texas Triumph Seed Company of Ralls, Texas (hereinafter Texas Triumph). Texas Triumph had purchased an old Massey combine and provided it to Carter Manufacturing. Carter Manufacturing was in the business of providing modifications and specialized additions to such equipment so that the combines could be used on research plots for seed companies to test the weight and moisture of each variety of seed.
Carter Manufacturing modified the combine by removing a two-row corn head from the combine and replacing it with the Model 343 corn head, which is a three-row corn head. This required modifying the drive shaft, mountings, and throat of the combine to attach and adapt the three-row corn head to the combine. In attaching the corn head, it was Carter Manufacturing's understanding that the combine would be a mobile harvesting unit, although it would be slower moving and used for light-duty operation in small, seed-test plots.
A.J. Batt, an employee of Carter Manufacturing, testified in his deposition that at the time the Model 343 was obtained, it was still painted green, although the paint appeared around five years old and was somewhat worn. Batt testified that he thought "the larger John Deere emblem kind of stickers" were still present on the corn head but that "any other stickers or things that were on the head, had already been painted over previously." Batt stated that it was Carter Manufacturing's general practice to try to preserve any warning stickers that still were present on the equipment, to paint over any warning stickers that had previously been painted over, and to sell the equipment on an "as is" basis without placing any additional warning stickers on the equipment they modified. Upon completing the modifications, Carter Manufacturing painted the corn head red, to match the color of the combine, and renamed the combine the "Carter Plot Machine." Carter Manufacturing did not place any warning labels on the corn head.
Wayne Slavens, a former employee of defendants from the early 1950s to 1978, designed combines and corn heads for defendants. Slavens attests that at the time Carter Manufacturing repainted the corn head, additional red and white warning stickers were available at John Deere implement dealerships. A copy of a then available warning sticker, as attached to Slavens' affidavit, is approximately four inches by six inches in size, states in bold print "DANGER," and shows a silhouette picture of a person being pulled by the leg into the front of a corn head. The warning sticker then states:
To avoid bodily injury or death, SHUT OFF engine before unclogging.
Rolls in gathering units move faster than you can let loose of stalk.
Batt also testified that the corn head could not, in a moving fashion, combine sorghum. He added that combining sorghum required a "cutter bar style head," which was different than a corn head. Slavens attests that the Model 343 was intended solely as a harvester of corn, and not sorghum. Slavens attests that the Model 343 was never advertised or *421 held out to be suitable for harvesting sorghum. Slavens attests that there are specially designed heads for sorghum and milo harvesting. Slavens further attests that the Model 343 corn head was designed for use on a combine moving through a field, and not for stationary use. Attached to Slavens's affidavit is a copy of the owner's manual for the Model 343 corn head. The "Operation" section of the manual provides instructions for operating the corn head and combine in low gear while becoming familiar with the corn head, and then operating at moderate ground speeds once accustomed to the machine. The manual provides numerous warnings regarding staying clear of all moving parts. Nothing in the manual makes any reference to hand-feeding corn or any other grain into a stationary, yet operating, corn head.
Texas Triumph began using the Massey combine, as modified with the Model 343 corn head, on its test plots. On the day before the accident, plaintiff was at the test plot where the combine was moving through and harvesting rows of corn. Plaintiff observed the combine while it was in operation that day, as he spent several hours working as close as twenty feet in front of the head, clearing weeds out of the corn rows. Plaintiff stated that he knew there was something in the corn head that would drag corn plants back into the machine and there was something that cut the corn plant off. On that same day, Jerry Anquiano, a co-worker of plaintiff, warned plaintiff to stay away from the front of the corn head.
On the next day, September 6, 1987, the workers at the test plot began to harvest sorghum with the machine. The workers, including plaintiff, handpicked heads of sorghum, filling burlap sacks with the sorghum heads. Ronald Terrell was in charge of the operation. He explained to plaintiff that the machine was going to be stationary and that plaintiff was to empty the burlap sacks of sorghum into the corn head while it was operating. Terrell told plaintiff to do this from the side of the corn head, to never get too close to the auger in the corn head, and to not go around to the front of the corn head. Terrell was at another position on the machine, weighing and measuring samples of the sorghum. When Terrell noticed that plaintiff was putting sorghum into the corn head from the front, Terrell "whistled [plaintiff] off," instructing him to never go around to the front of the corn head. Terrell explained how powerful the gathering chains were and that plaintiff should not worry about any sorghum heads that spilled into the front of the corn head. Although plaintiff was Spanish, Terrell made his warnings in English, and plaintiff replied in English that he understood the warnings.
At the time of the accident, the corn head was raised, and plaintiff was to be emptying the 10-20 pound bags into the corn head from the side. Terrell testified in his deposition that he was weighing and measuring a sample of sorghum when he heard screams from the plaintiff. Terrell testified that he saw plaintiff at the side of the corn head just fifteen to twenty seconds prior to hearing the screams. Terrell immediately shut off the power to the machine.
Terrell testified that plaintiff was stuck in the front part of the corn head in the middle of the three rows. Plaintiff admitted that he was emptying the bags of sorghum from the front of the corn head, that he emptied approximately fifteen to twenty bags from the front of the corn head, and that he walked too far forward and became entangled in the machine. Plaintiff suffered severe injuries when he became entangled in the machine.
Terrell testified that if Texas Triumph had a sorghum head, they would have not been doing the work by the stationary machine, but would have been moving the combine through the field like the day before when they were combining corn.

II. Motion For Summary Judgment
Defendants argue for summary judgment on several grounds:
1) plaintiff and Triumph's use of the corn head as a stationary milo processor where milo was hand fed into the corn head was not, as a matter of law, a reasonably anticipated use of the corn head;
2) the corn head, at the time of the accident, was not in substantially the same *422 condition as when it was manufactured, as all of the warning labels originally placed on the corn head at the time defendants sold it had been obliterated and painted over;
3) defendants cannot be liable in negligence or strict liability because defendants became merely a supplier of a component part of the overall machine as a result of the substantial modifications made by Carter Manufacturing;
4) defendants cannot be liable for failure to warn because plaintiff received more than adequate warnings from two co-employees just prior to the accident and the danger was open and obvious;
5) the painting over of the original warning stickers and the misuse of the corn head as a stationary milo processor constituted a superseding, intervening cause.
6) the opinions of the expert witnesses of plaintiff regarding additional precautionary designs and warnings are inadmissible under Daubert, and therefore plaintiff cannot make a submissible case;
7) the dangers of the corn head were open and obvious to plaintiff and his co-workers, and therefore, as a matter of law, the corn head was not unreasonably dangerous or negligently designed or manufactured; and
8) the alterations and modifications to the corn head, including the painting over of the warning signs and the utilization of the corn head as a stationary milo harvester constituted an unforeseeable misuse of the product.

A. Strict Liability Claims
Plaintiff asserts strict liability claims of defective design and failure to warn. Plaintiff's strict liability claims are governed by the Missouri Products Liability Statute, Mo. Rev.Stat. § 537.760.

1. Defective Design Claim
Under Missouri law, to prevail in a products liability action under a theory of defective design, an injured plaintiff must establish that 1) defendant sold the product in the course of its business; 2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; 3) the product was used in a manner reasonably anticipated; and 4) plaintiff was injured as a direct result of such defective condition as existed when the product was sold. Waggoner by Waggoner v. Mercedes Benz of North Am., Inc., 879 S.W.2d 692, 694 (Mo.App.E.D.1994). It is undisputed that defendant sold the corn head in the normal course of its business.
Defendants first argue that the corn head was not used in a reasonably anticipated manner, an element common to both defective-design and failure-to-warn strict liability theories. "The concept of reasonably anticipated use, however, includes misuse and abnormal use which is objectively foreseeable." Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 381 (Mo. banc 1986). While defendant points to some ways in which it asserts the corn head was not used in a reasonably anticipated manner, many of these changes in use seem irrelevant to the issues of this case, such as the placement of the Model 343 on the Massey combine. The critical question, as the facts appear before the Court, is whether the use of the corn head for stationary, hand-feeding by a person was a reasonably anticipated or an objectively foreseeable misuse. Wayne Slavens, defendants' expert, attests that the Model 343 corn head was designed and intended only for mobile harvesting of corn and not for hand-feeding milo or any other grain into the auger while the combine and corn head were stationary.
Plaintiff's only evidence as to the reasonably anticipated use of the corn head is in the affidavits of its designated experts, Harold Wakeley and Terrence Willis. Wakeley attests that "it is customary for farmers to salvage and pick up a down crop and thereby hand carry it to a stationary combine or stacking it in a heap which is then hand fed into a stationary combine" and that "many farmers over the years have told [Wakeley] and shown [Wakeley] that this is customary practice." Willis attests that the corn head can be and is used in a stationary mode, such as when a crop has fallen down due to weather *423 or machine action and cannot be harvested by a moving combine.
Defendants cite to Baker v. International Harvester Co., 660 S.W.2d 21, 23 (Mo.App. E.D.1983), in which the Missouri court of appeals stated the primary use of a combine is harvesting grain or beans in a field in a rural area. Baker does not foreclose the possibility that the use of the corn head in a stationary position being hand fed was not an abnormal or misuse of the corn head which was objectively foreseeable. See Nesselrode, 707 S.W.2d at 381. Thus, based upon the affidavits of plaintiff's experts, a factual question for trial remains as to whether the product was used in a manner reasonably anticipated, to the extent that its misuse or abnormal use was objectively foreseeable, even if, as the record strongly suggests, plaintiff was not using the corn head in a manner actually intended by the manufacturers.
The Court next considers plaintiff's theory that the corn head was defectively designed. Plaintiff's claim of defective design is grounded in the testimony of his expert witnesses. Plaintiff argues that, for a person standing in front of the corn head  operating in a stationary position, there is a certain distance from the gathering chains and hooks at which a person is clearly safe and a certain distance from the gathering chains at which a person is clearly unsafe and likely to get caught in the moving parts. Plaintiff asserts that in between these two areas there is a zone of hidden danger where "the gathering chains suddenly emerge from under the snout" and "make a rapid turn to progress toward the snapping rolls." Plaintiff asserts that one cannot know where the zone of clear safety ends and where the zone of hidden danger begins, because the hooks on the gathering chains are small and are moving very rapidly, and therefore, do not present a clear visual target for determining the exact location of the moving, dangerous parts of the corn head.
Wakeley, an expert with M.S. and Ph.D. degrees in experimental psychology, attests that the point from where the gathering hook emerges from under the snout is not "a suitable target for visual fixation" because of the smallness of the hook and the high speed at which the gathering chain is turning around a sprocket at that point. Wakeley attests that "the hooks emerging from under the snout were the hazard" and that plaintiff was not aware that this was the hazard. Wakeley admits that the gathering chains and hooks, and the danger presented by them, become visible after they have cleared the turn around the sprocket and begin moving in a straight line away from the front of the corn head. Terrence Willis, plaintiff's second expert, similarly attests that, because of the speed at which the gathering chains suddenly emerge from underneath the snout and make a rapid turn to progress toward the snapping rolls, a person cannot visually determine where the safety region ends and the danger zone begins. Willis does admit, however, that at the point the gathering chains and hooks pass by the snapping rolls, the danger presented is open and obvious.
Defendants have submitted a videotape of the corn head in operation, as attached to a John Deere Combine. The video shows the corn head in operation moving through a corn field and also shows a close-up view from the front of the corn head operating in a stationary position without any corn or cornstalks in it. From the video, it is readily apparent that there is a clear zone of danger, as the gathering chains and hooks can be readily seen moving for several feet back towards a large, moving auger. It is clear that the gathering chains and hooks perform essential functions of pulling cornstalks and corn to the location of the snap rollers, and up into the combine. The video also shows that the snouts of the corn head extend approximately three to four feet in front of the area where the gathering chains and hooks emerge from under the snouts and that there appears to be no moving parts in that three to four foot area.
Defendants seek to strike the above testimony of both of plaintiff's expert witnesses. The Court now turns to this motion, which will bear directly on defendants' motion for summary judgment.
The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 allows expert testimony based upon "scientific, technical, or other *424 specialized knowledge," if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. It is the trial judge's duty to ensure that any and all scientific testimony is both relevant and reliable.[2]Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384 (8th Cir. 1995) (citing Daubert v. Merrell Dow Pharmaceuticals. Inc., 509 U.S. 579, 591, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469 (1993)). Such evidence is admissible if it is relevant and reliable, i.e., if it is scientifically based and will assist the trier of fact in determining a fact in issue. See United States v. Reynolds, 77 F.3d 253, 254-55 (8th Cir.1996) (per curiam); Pestel 64 F.3d at 384. As recently explained by the Eighth Circuit, this Court "must ... ensure that `an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Penney v. Praxair, Inc., 116 F.3d 330, 333 (1997).
Although the Supreme Court decision in Daubert involved "scientific" evidence, the Eighth Circuit has similarly applied the teachings of Daubert to cases involving expert testimony from engineers  seemingly involving "technical or other specialized knowledge." See, e.g., Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 297 (8th Cir. 1996) (applying Daubert to expert opinions which were based upon "basic engineering principles"), cert. denied, ___ U.S. ____, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997); Pestel, 64 F.3d at 384 (affirming application of Daubert to testimony of mechanical engineer who proposed a safer designed machine). This Court, therefore, must apply Rule 702, and the teachings of Daubert, to the testimony of plaintiff's experts, to determine whether their testimony, be it characterized as based upon "scientific" or "technical" knowledge, is admissible under Rule 702. Regardless of the characterization, Rule 702 mandates that an expert's testimony be based upon "knowledge." Fed.R.Evid. 702. Daubert explained that while "knowledge," as used in Rule 702, does not require exact certainly, it does connote more than subjective belief or unsupported speculation. Daubert, 509 U.S. at 594, 113 S.Ct. at 2797. The Supreme Court explained that the term "knowledge" referred to "`any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" Id. (quoting Webster's Third New International Dictionary 1252 (1986)). Finally, the Court notes that, in analyzing each expert's testimony, it must focus on the principles and methodology employed by the expert, and not on the conclusions generated by the expert. Daubert, 509 U.S. at 594, 113 S.Ct. at 2797.
Under Daubert, the court must make an assessment whether the reasoning and methodology underlying the expert's testimony is valid. Peitzmeier, 97 F.3d at 296-97. Under Daubert, four non-exclusive factors guide the trial court in determining whether proffered expert evidence is reliable: whether the technique employed or relied upon by the expert has been tested; whether the technique has been subjected to peer review and publication; the technique's rate of error, if known; and whether the technique is generally accepted by the scientific community. Reynolds, 77 F.3d at 254 n. 1; Pestel, 64 F.3d at 384. The Court is mindful of Daubert's emphasis that these four factors are not exclusive, and that many factors may bear on a court's Rule 702 inquiry.
Both experts pinpoint the defect in the corn head as the lack of clear visibility of the point at which the gathering chains and hooks emerge from under the snouts of the corn heads. The experts fault the small size of the hooks and the speed at which they turn on a sprocket as they emerge from under the snout and make a turn toward the snap rollers. Thus, the experts assert that this alleged defective design made the corn head unreasonably dangerous because of the *425 difficulty in visibly determining the location of the rapidly moving and dangerous parts.
The Court now considers the basis of Wakeley's expert testimony. Wakeley has a B.S. in psychology, and M.S. and Ph.D. degrees in experimental psychology. He does not have a mechanical engineering degree, is not a licensed professional engineer, has never had design engineering classes, and has never designed any mechanical machinery similar to the corn head in this case. In his deposition, he admitted that he has never published anything related to the design of agricultural machinery, that he has never had responsibility for any safety design for any product that was ever mass marketed, and that he has had very little experience, if any, around combines and corn heads. While Wakeley testified that the dangerous defect in the corn head was the point where the hooks and gathering chains emerged from under the snouts, he admitted that he had never seen the Model 343 corn head in operation. Wakeley admitted that the corn head was "pretty much the same design" as other competing corn heads. Wakeley's testimony further suggested that he did not intend to give any testimony that a different design should have been used in the Model 343 corn head.
The Court finds that, on the issue of whether an unreasonably dangerous defective condition existed in the corn head, Wakeley's testimony as to what he believes constitutes the defective condition in the corn head, is inadmissible. Wakeley has virtually no relevant background in the design or function of products similar in function and operation of the corn head. His practical experience, outside of any formal training, research or study, with the operation of agricultural machinery is negligible. While he attempts to state what the precise defect in the corn head is, he has not even seen the corn head in operation. His deposition is devoid of any reliable basis by any calculations or otherwise, for his conclusion that the hooks and chains could not be visibly observed by the human eye. Thus, any testimony of Wakeley's as to what constitutes the defective condition of the corn head is too speculative and unreliable to pass the requirements of Daubert and Rule 702 on the issue that the corn head was defectively designed.[3]
Willis has B.S. and Ph.D. degrees in mechanical engineering and currently works in an engineering consulting firm. Willis has published work-safety type articles, with such titles as "Safety in the work place," "Engineering basis for warnings," and "Safety and mechanical design, the role of codes and standards." He has not published any articles directly related to agricultural equipment, nor does he possess any background or involvement in agricultural engineering or agricultural engineering organizations. When asked about the majority of the type of consulting work he does, Willis stated that he did design flight actuators for the U.S. Air Force, that he did stress, fatigue, structure and fracture analysis for commercial aircraft components including engines and fuselages, and that he did design work for "inboard flaps" on aircraft for the U.S. Air Force. Willis has never patented any product or design. He has been involved in the design of a helicopter fuselage and a "honeycomb sandwich panel." Willis has not been involved in the design of any agricultural machinery other than putting guards on his personal tractor at his home. Willis has done forensic analysis in cases involving guarding power take off shafts and in the support structure of auger conveyors. Willis has never had any warning design responsibility with any mass-marketed products and has never designed any warnings for any combines or corn heads.
In reaching his opinion regarding the Model 343 corn head, Willis testified that he had not performed or done any diagrams, videos or field testing, and that he had not drawn or designed any of the warnings, tapes, barricades, or awareness barriers he was recommending should have been employed. Willis stated that he has never previously testified in any cases involving a corn head or a *426 combine. Willis testified that he has never seen a Model 343 corn head in operation, although he did look at the corn head while it was unattached to a combine. He testified that he has observed corn heads in operation, although he does not know the make or models of such corn heads, and that, except with regard to this action, he was not observing them for any engineering purpose. Willis further stated that he has never stood within ten feet of an operating corn head while the combine was stationary. Willis has never hand fed any grain into a corn head, and has had only a small amount of experience farming by assisting a farmer when he was a child.
Willis testified that he was not employing any accident reconstruction principles or skills in reaching his conclusions. Willis testified that his analysis focused on any hazards involved in the mechanical design of the corn head and what the design people should or could have done if a defect existed. Willis identified the defect as the "failure to provide adequate protection at the hazards associated with the gathering chains and the snapping rolls." Willis stated that just by observing corn being pulled into a corn head by the gathering chains, one could not appreciate the danger of the possibility of being pulled into the machines by the hooks and gathering chains, which extend in front of the snapping rolls. Willis stated that the hooks and gathering chains move very rapidly, making them difficult to see. Willis stated that his conclusion that a person could not visibly observe the hooks and chains as they came around the sprockets was based upon his "engineering evaluation of machinery and how it works," although he never explained the contents or steps in his evaluation other than saying, "I guess as an engineer, I know what it looks like in the running mode."
Willis also proposed a design change in adding an "awareness barrier" to the corn head, to be placed in front of the point where the gathering chains and hooks emerge from under the snout. Willis explained that the awareness barrier would consist of two forward-placed flaps that would permit corn stalks to easily pass by them, but would serve as a warning barrier to let persons know not to get any closer to the moving gathering chains and hooks. Willis has not drawn a diagram of the style, size or characteristics of his awareness barrier, but rather states in his deposition that "[i]f John Deere wishes to involve further investigation on that, that's  that would be their choice." Willis has done very little more than conceive the rough idea of the awareness barrier. He has not drawn a design of it, does not know what materials to use in making it, and is unaware as to whether it would last under field conditions. Further, he knows of no one else who has done any designing or testing of such an awareness barrier on a corn head. He knows of no governmental or industry standards in 1974 or in the present that mandate such an awareness barrier. He does admit that it is only an awareness barrier and would not prevent a person from walking through it.
After careful consideration, the Court finds that Willis's testimony and opinion as to the alleged defective design of the corn head lacks sufficient basis to meet the reliability requirements of Daubert and Rule 702. Plaintiff asserts that the defect in design that made the product unreasonably dangerous is the inability for a person to visibly see the precise area where the hooks and gathering chains emerge from under the snout. At the same time, plaintiff concedes that other visibly moving parts of the corn head present open and obvious dangers. Indeed, the video tape of the corn head in operation clearly shows that, in general, the Model 343 corn head in operation has many moving parts with visible, open and obvious dangers. In his deposition, Willis opines that there is the hidden zone of danger where a person cannot visibly observe the area where the hooks and gathering chains emerge from under the snouts. This opinion is without basis in Willis's deposition testimony. Willis has very little experience working with agricultural equipment, and none with corn heads. The area of his consulting work further suggests limited experience with mechanical design of moving parts; he has more experience in structural engineering areas.
Aside from this lack of experience in this area, Willis cannot testify that he has even *427 seen the Model 343 corn head close-up in operation. While he "visualizes" what the Model 343 would look like in operation based upon his mechanical engineering background, this does not satisfy the basis for his conclusions. He states that the hooks and chains move very rapidly  a statement that is at the core of his opinion as to the allegedly defective design  but does not provide any supportive basis for this general statement. While the Court in no way intends to play an amateur scientist or engineer, the Court, in carrying out its Rule 702 screening function, should at least, in a factual situation like the present, require an engineer to be able to provide some calculations of the speed at which an allegedly dangerous component is moving, if such part is allegedly moving too fast to be visible to the human eye.
Willis's suggested awareness barrier, assuming it presents a change in design and not just a warning, amounts to a subjective speculative recommendation. Willis did not provide any more than a sketchy idea of what the awareness barrier would be. He had no design specifications regarding the size of such barriers or the materials out of which they would be made and could make no assessment of whether such awareness barriers would interfere with the product's intended use or could withstand use in field conditions. Further, he could point to no studies, designs, or tests conducted by others to provide a basis in engineering for his proposal. The Eighth Circuit has determined in similar circumstances that such testimony does not satisfy the Rule 702. See Peitzmeier, 97 F.3d at 297-98; Pestel, 64 F.3d at 383-84.
The Court concludes that, like Wakeley's testimony, Willis's testimony too speculative and lacks a reliable basis in engineering, science or otherwise to be admissible. Accordingly, with no other evidence presented as to the allegedly defective design, the Court finds that plaintiff has failed to present a triable issue of material fact as to whether a defect in design existed in the corn head that made the corn head unreasonably dangerous. Thus, summary judgment is appropriate on plaintiff's strict liability, defective design claim.

2. Failure to Warn Claim
Under a theory of failure to warn, a plaintiff must show that 1) the defendant sold the product in the course of his or her business; 2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; 3) the defendant did not give an adequate warning of the danger; 4) the product was used in a manner reasonably anticipated; and 5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning. Campbell v. American Crane Corp., 60 F.3d 1329, 1331 (8th Cir.1995). The fifth element, causation, has two separate requirements: 1) the product for which there was no warning must have caused plaintiff's injuries; and 2) the plaintiff must show that a warning would have altered the behavior of those involved in the accident. Tune v. Synergy Gas Corp., 883 S.W.2d 10, 14 (Mo. banc 1994). Although the Court has concluded that plaintiff's defective-design claim is without merit, under Missouri law, "a manufacturer can be held strictly liable for failure to warn of the dangers of a product even if there is no defect in its design." Belec v. Hayssen Mfg. Co., 105 F.3d 406, 408 (8th Cir.1997). As discussed above, it is undisputed that defendants manufactured and sold the corn head in the course of its business. Also, as concluded above, a factual question exists as to whether the product was used in a manner reasonably anticipated, to the extent that its misuse or abnormal use was objectively foreseeable.
Defendants argue that plaintiff cannot maintain a failure to warn action because the painting-over of the manufacturer's warnings on two occasions operates to absolve defendants from any liability. The Court views this argument as asserting either that there is no material factual issue as to whether defendants gave an adequate warning of the danger or there is no material factual issue as to whether plaintiff's injury was a direct result of the Model 343 corn head being sold without an adequate warning. See Campbell, 60 F.3d at 1331 (setting forth elements of strict liability failure to warn claim).
The Court first considers the issue of whether the warnings provided by defendants *428 were adequate. It is undisputed that defendants placed two warning stickers on the corn head, the contents of which are set out above. It is also undisputed that these warning stickers were painted over twice, when the corn head was repainted on two occasions, both times after leaving the defendants' factory where it is undisputed that these warning stickers were attached. There is no evidence that there were any warnings on the corn head on the day of the accident. Plaintiff alleges that the lack of any specialized and specific warning, makes the corn head an unreasonably dangerous product. In support of this theory, plaintiff relies upon the testimony of his expert witnesses.
Again, the Court must address defendants' motion to strike plaintiff's expert witness testimony under the standards of Daubert and Rule 702. The Court first considers what testimony of Wakeley is admissible, if any, evaluating Wakeley's deposition and affidavit testimony. Wakeley attests that the two original warning stickers installed on the Model 343 by John Deere were too small to be legible and effective, were placed at location remote from the hazard, and, from the location of the hazard, were at a difficult angle from which a person near the location of the hazard could read. Wakeley further attests that high contrast chevrons and warnings placed on the snout of the corn head, would have provided a far more effective warning. In his deposition, Wakeley recommended a larger warning sticker that contained a picture of a person being dragged into the gathering chains and the use of the word "Danger." Wakeley further suggested larger, bright, contrasting material be placed up on the snout area of the corn head, close to the front point of the gathering chains, although he could not identify any agricultural equipment that utilized the type of chevrons he was advocating. Wakeley added that such warnings could be made of plastic, as they would be more difficult to paint over. When pressed, Wakeley admitted that he had no basis for saying how long any plastic material would hold paint or how long paint would last on plastic or if plastic would withstand the stress of normal field usage. Wakeley further admitted that he had no idea what type of plastic should be used on the snouts or what type of plastic was available in 1974.
Wakeley admitted that the warnings used by defendants in 1974 did not violate any standard or regulation for warning requirements. Rather, Wakeley stated that the warnings did not meet the "best practice" standard as determined by "handbooks on human factors engineering," although, when pressed, he could not point to any specific handbooks. Also, when asked, Wakeley could not say that he knew the content and wording of the original John Deere warnings. Wakeley admitted that the warnings he was advocating were specifically specialized for corn heads, despite his limited experience with such equipment.
Wakeley stated that he did not evaluate awareness barriers and did not know any details surrounding Willis's proposed awareness barrier. Wakeley stated that, in reaching his opinions, he relied upon a book about warnings, but had not brought any other materials upon which he relied to his deposition. He also stated that he relied on materials dealing "with the theory of how you see things when they are placed at an angle to your line of view as opposed to normal to it." Wakeley admitted that he did not have any human factors experience in which he designed or worked on decals or warnings or chevrons with respect to agricultural machinery.
Wakeley stated that he reviewed the John Deere manuals. At his deposition, Wakeley attempted to compare the John Deere warnings with a "McCormick" warning from a "husker/shredder" made in the 1930s, with a warning from an "Alice-Chalmers 1914-1985," with a warning on a John Deere plow, and with warnings that were used in Sweden. Wakeley admitted that he had no knowledge of any human factors testing done by John Deere regarding the design of the corn head or the warnings initially placed upon the corn head.
Wakeley stated that he had done no testing as to whether any of his suggested warnings would have changed the plaintiff's behavior or prevented the accident. He stated that testing could be done but that it was *429 not necessary to do so because similar testing of warnings had been done in developing ANSI standards and other warning systems and was "fairly applicable" to the present situation. When asked what ANSI standard applied to the corn head design and configuration, Wakeley stated that there are applicable standards, but could not identify which standards applied. Wakeley stated that he relied upon ANSI standards in evaluating the corn head, but he did not know whether John Deere had violated any ANSI standard.
Wakeley has never designed a warning for any marketed product and has never done any consulting or design work or human factors analysis on any agricultural machinery. Wakeley stated that he has done some work in human factors in the area of vibrations of machines and in the transmittance of light and infrared radiation.
The Court concludes that Wakeley's opinion that the warnings were not adequate because of their size and location is supported by a reliable basis and therefore meets the requirements of Daubert. Although he did not provide the most clarity, Wakeley was able to base his opinion on books, materials, and theories in the field of human factor and safety, addressing the question of why the location and size of the warnings may not have been adequate.
However, the Court concludes that Wakeley's opinion as to the use of high contrast chevrons on the snouts of the corn head and as to the implementation of plastic materials on the snout to serve as warnings are inadmissible, as Wakeley has provided no reliable basis grounded in his field of expertise or otherwise for his opinion that such warnings should have been used. Plaintiff has never designed any such warnings for any marketed products, especially agricultural machinery. He could provide no basis for his opinion that John Deere should have used plastic materials in designing warnings on corn heads in 1974. He could not provide any detail as to whether such materials were available at that time, or if available, whether they would be feasible. Rather, his opinions regarding the use of plastic appear to be no more than his subjective speculation. Similarly, Wakeley could not provide any details as to the use of high contrast chevrons at the snouts of the corn head. He could point to no other machinery that had employed such a warning device.
The Court also finds that Wakeley's testimony and criticisms regarding the content of the warnings used by John Deere are inadmissible. Wakeley's opinion wholly lacks the reliability required under Rule 702. Wakeley admitted in his deposition that he did not know what the John Deere warnings said. Yet he insisted that they did not meet the "best practice" standard determined by human factors handbooks. At the same time, he admitted that the warnings used in 1974 did not violate any standard or regulation, as he could not identify which ANSI standards applied to the corn head. Wakeley's opinions and criticisms of the John Deere warnings do not have a sufficiently reliable basis to satisfy Rule 702. It seems implausible to allow Wakeley to give an expert opinion as to the adequacy of the content of the warnings, when he could not even testify as to the what the warnings actually said.
The Court now considers Willis's testimony. Willis stated in his deposition that he had no opinion as whether any "English or verbiage should have been used" to warn users of the corn head. Rather, Willis proposed that a circumferential striping of black and yellow could be used on the entire length of the corn head snouts to identify the hazard areas on the corn head. When asked for details as to the design and placement of such stripings, Willis indicated that he would need to consult an industrial psychologist to determine the "optimum" warning. Willis attests that the stripings should be placed concentrically along the full length of each snout on the corn head. Willis attests that these would have been appropriate hazard zone identification methods for warning plaintiff and other persons of the nature and extent of the danger involved in the corn head. Willis attests that the black and yellow stripings are a nationally recognized symbol for hazard zone identification. In his deposition, Willis stated that the stripings *430 would indicate to a person that he "is in proximity in some way to a hazard where we don't think you ought to be" but that the stripings would not "identify the specific hazard."
Willis could not identify any standards or regulations in effect at the present or in 1974 which mandated or required the use of striping that Willis was proposing. Willis stated that he did not think it was important, in formulating his opinion, to know of any sources which advocated the use of stripings such as or similar to the ones he was advocating. Willis stated that he was not aware of any other corn heads that employed such striping he was recommending and that he did not know if such striping was "state of the art" in 1974.
Willis has not designed any such warning stripings or made drawings of his proposal. Willis has done no testing of his proposal, nor did he indicate that he was relying on any comparable testing on any similar warnings in proposing his stripings warning. Willis suggested that the stripings could be painted on or could be made of plastic, but Willis could give no opinion regarding any paint or plastic that could withstand the wear and abrasion of use in a cornfield.
Similar to Wakeley's proposal for the use of high contrast chevrons on the front part of the corn head, the Court concludes that Willis's proposal for the stripings warning is inadmissible under Rule 702. Willis has provided no reliable basis grounded in his field of expertise or otherwise for his opinion that such warnings should have been used. He cannot point to any other instance where comparable warnings have been employed, he has only a rough idea of how the stripings would be designed, and he has identified no studies or tests done by him or anyone which indicate that such warnings would have been useful or feasible. Further, he could not give any opinion as to whether such warnings would have been durable, if placed on the corn head. Rather, Willis's stripings proposal appears to be nothing more than his subjective idea created for this litigation and does not appear to be based upon any reliable knowledge in any relevant professional fields.
The Court must finally consider whether factual issues regarding the element of causation are present. In Missouri, causation requires a plaintiff to prove the product for which there was no warning, or for which there was an inadequate warning, must have caused plaintiff's injuries and that an adequate warning would have altered the behavior of those involved in the accident. See Tune, 883 S.W.2d at 14. As set out above, the only issue of material fact regarding the adequacy of the warnings of defendant is grounded on Wakeley's opinion that the location and size of the warnings actually employed by defendant were inadequate.
The Court notes that the fact that plaintiff walked up inside the front of the corn head and was injured cannot create a factual issue for trial on the element of causation because the warnings initially placed on the corn head by John Deere were painted over on two occasions. In his deposition, Wakeley could not testify that, if the warnings he was recommending were used by John Deere, those warnings would likely not have been painted over and would have remained present to provide what Wakeley considers an adequate warning to users of the product. Without any of the initial warnings present, and without any showing that plaintiff's expert's recommended warnings would have survived the paintings of the corn head, the Court finds that plaintiff has not raised a factual issue for trial that any lack of adequate warning by defendants was a cause of plaintiff's injuries.
Furthermore, even if the Court were to allow the testimony of Willis and Wakeley that the stripings or high contrast chevron warnings should have been placed on the snouts of the corn head, such testimony cannot not raise a factual issue as to whether the lack of such warnings caused plaintiff's injuries. At his deposition, Willis testified he could not give a professional opinion that, had defendant in 1974 placed black and yellow stripings on the snouts of the corn heads, the stripings would not have been obliterated by paint during the two times the corn head was painted. Willis could not give an opinion that the accident would not have occurred if the stripings had been on the snouts of the *431 corn head. In his affidavit filed in opposition to defendants' summary judgment motion, Willis now attests that such stripings would have likely survived any subsequent painting of the corn head. Willis attests that "larger and more prominent warnings located on the corn head would have signaled to the paint crews the seriousness of the mission" of such more prominent warnings, and "may have induced the paint crew to leave the warning notices intact." Willis recommends that a yellow and black plastic covered snout area would be less likely to be painted over or obliterated by paint "if for no other reason than it is a universally recognized color coding for hazard zone identification." Willis's affidavit is contradictory to his earlier testimony and appears to be offered only as an attempt to avoid summary judgment. The Court finds that Willis' testimony in his affidavit falls squarely within the sham exception to summary judgment, and the Court thus disregards such affidavit testimony. See American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 110-12 (8th Cir.1997).
Finally, on the issue of whether an adequate warning would have altered the behavior of those involved in the accident, the record shows that plaintiff was verbally warned by his supervisors on several occasions just prior to the accident that he should never go in front of the corn head near the region of the snouts. Yet, the record clearly shows that plaintiff inexplicably walked in front of the corn head and up in between the snouts and was subsequently injured. Even though plaintiff was given this prophylactic warning to always stay clear of the front of the corn head, plaintiff attempts to assert that he did not know of the specific area of danger within the corn head.
In Klugesherz v. American Honda Motor Co., Inc., 929 S.W.2d 811, 814-15 (Mo.App. E.D.1996), a five year old child was injured while operating an all-terrain vehicle and brought a products liability failure-to-warn claim against the manufacturer. The child had been given firm verbal warnings from his parents and others that he was not permitted to ride the all-terrain vehicle on any occasion, yet the child ignored such warnings. Id. The court determined that because, the verbal warnings imparted all the information necessary to the child regarding the product that would have likely influenced the behavior of the child, there was "no basis for concluding that additional warnings would have altered the behavior of anyone involved in the accident." Id.
Here, plaintiff was given explicit verbal warnings to stay clear of the front of the corn head. The warnings offered by plaintiff's experts do no more than warn a person that there is danger in the snout area of the corn heads. They do no more than indicate that a person should stay clear of the area in between the snouts of the corn head. Indeed, Wakeley testified in his deposition that his proposed warnings would indicate to a person that he "is in proximity in some way to a hazard where we don't think you ought to be" but that the stripings would not "identify the specific hazard." Such testimony is at odds with plaintiff's assertions that there was a specific hidden danger in the snout area of the corn head of which plaintiff was unaware and could not appreciate. Thus, plaintiff has failed to present any evidence that his experts' proposed warnings would have in any way have altered the behavior of plaintiff, in light of the verbal warnings that plaintiff received. Defendants are entitled to summary judgment on plaintiff's strict liability claims.

B. Negligence Claims
In any negligence action, a plaintiff must establish that 1) defendant had a duty to the plaintiff, 2) defendant failed to perform that duty, and 3) defendant's breach was the proximate cause of the plaintiff's injury. Hecker v. Property Ins. Placement Facility, 891 S.W.2d 813, 816 (Mo. banc 1995); Martin v. City of Washington, 848 S.W.2d 487, 493 (Mo. banc 1993).
Negligence claims have a higher threshold of proof than strict liability claims. Peitzmeier, 97 F.3d at 296 n. 2. Because the Court concludes that plaintiff cannot present triable strict liability claims for defective design or for failure to warn, the Court similarly finds that plaintiff has not presented issues of material fact necessary to preclude summary *432 judgment on his claims of negligence against defendants. See id. Because plaintiff has not raised a material issue of fact for trial as to whether a defect in the design of the corn head existed, no factual issue for trial exists as to whether defendants breached any duty to design a safe product. Because plaintiff has not raised a factual issue for trial on the causation element of his strict liability failure to warn claim, the Court finds that no issue of material fact exists for trial on whether any breach of defendants' duty to warn was the proximate cause of plaintiff's injuries.
Accordingly,
IT IS HEREBY ORDERED that the motion of defendants John Deere Company and Deere and Company to exclude expert witness testimony of plaintiff's proposed experts, Harold Wakeley and Terrence Willis [document # 29] is GRANTED.
IT IS FURTHER ORDERED that the motion of defendants for summary judgment [document # 28] is GRANTED.
A separate judgment will accompany this memorandum and order.
NOTES
[1] Plaintiff has apparently abandoned his claim that the corn head should have possessed a clutch to disengage moving chains, as plaintiff presents no evidence whatsoever on this claim in response to defendants' motion for summary judgment.
[2] Engaging into an inquiry as to the admissibility of expert testimony at the summary judgment stage is appropriate and permissible. See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 597, 113 S.Ct. 2786, 2798-99, 125 L.Ed.2d 469 (1993) (affirming lower court's striking of expert testimony at summary judgment stage of proceedings); Fed.R.Civ.P. 56(e) (requiring affidavits in support of summary judgment to "set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein").
[3] In his deposition, Wakeley testified that his area of intended testimony was with regard to whether the warnings provided by defendants were adequate. Thus, the Court will later address Wakeley's testimony in analyzing plaintiff's failure to warn claim.